**CATSKILL MOUNTAINS CHAPTER OF TROUT UNLIMITED, INC.,** Theodore Gordon Flyfishers, Inc., Catskill–Delaware Natural Water Alliance, Inc., Federated Sportsmen's Clubs of Ulster County, Inc., and Riverkeeper, Inc., Plaintiffs,

v.

**THE CITY OF NEW YORK,** New York City Department of Environmental Protection, and Joel A. Miele, Sr., Commissioner of Department of Environmental Protection, Defendants.

No. 1:00CV511 FJSRFT.

United States District Court, N.D. New York.

Feb. 6, 2003.

Pace Environmental, Litigation Clinic, Inc., White Plains, Attorneys for Plaintiffs,

Karl S. Coplan, Esq., Megan Brillault, Legal Intern, Lisa Cox, Legal Intern, Nicole Parisi–Smith, Legal Intern, John Paul, Legal Intern.

City of New York, Office of Corporation Counsel, New York, Attorneys for Defendants, William Plache, Esq., Hilary Meltzer, Esq., Janet Siegel, Esq., of Counsel.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

## I. INTRODUCTION

On November 20, 1998, Plaintiffs served Defendants, the New York State Department of Environmental Conservation ("DEC"), and the Environmental Protection Agency ("EPA") with a Notice of Intent to Sue. On March 31, 2000, Plaintiffs filed their complaint in this action. *See* Dkt. No. 1. On October 6, 2000, this Court dismissed Plaintiffs' turbidity and thermal discharge claims for failure to state a claim. *See* Dkt. No. 19. Thereafter, on October 21, 2001, the Second Circuit reversed in part this Court's decision and remanded this action for further proceedings. *See* Dkt. No. 32.

Subsequently, Plaintiffs filed a motion for partial summary judgment, seeking a declaration that Defendants had violated the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), by discharging turbidity and suspended solids from the Shandaken Tunnel into the Esopus Creek without a permit, including 347 days between February 1, 1995 and December 30, 1998.[1] *See* Dkt. No. 44. On June 4, 2002, the Court granted Plaintiffs' motion for summary judgment on the issue of liability and directed the parties to contact Magistrate Judge Treece's chambers to discuss how this ac-

tion could be expedited to ensure that a trial on the issue of damages could be scheduled as soon as possible. *See* Dkt. No. 66.

The Court held a bench trial commencing on January 8, 2003, to determine the amount of civil penalties, if any, that Defendants should be required to pay pursuant to 33 U.S.C. § 1319(d), and what form of injunctive relief, if any, the Court should impose upon Defendants for operating the Shandaken Tunnel without a SPDES permit in violation of the CWA. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the following constitutes the Court's findings of fact and conclusions of law with respect to these issues.

## II. DISCUSSION

### A. Findings of Fact

Plaintiffs Catskill Mountains Chapter of Trout Unlimited, Inc. ("CMCTU"), Theodore Gordon Flyfishers, Inc. ("TGF"), Catskill–Delaware Natural Water Alliance ("CDNWA"), Federated Sportsmen's Clubs of Ulster County, Inc. ("FSC"), and Riverkeeper, Inc., are not-for-profit corporations organized under the laws of the State of New York. Members of CMCTU, TGF, CDNWA, and FSC live near the Esopus Creek and enjoy the Esopus Creek for numerous activities, including, but not limited to, flyfishing. Riverkeeper, whose mission is to protect the environmental resources of the Hudson River and its tributaries, including the Esopus Creek, has members who fish in the Esopus Creek.

At trial, Bert Darrow, a member of TGF and CMCTU and a professional flyfisherman and licensed flyfishing guide, testified that prior to 1996 he used the Esopus

---

1. According to Defendants' Exhibit "D–17," the Shandaken Tunnel was in operation on 1,015 days between February 1, 1995 and December 30, 1998.

Creek as his primary fishing location for personal as well as business uses. However, since that time, the turbid water in the Esopus Creek has made fishing difficult because the trout cannot see cast lines and flies and dangerous because the fishermen cannot see the bottom of the Creek. As a result, he does not fish in the Esopus Creek very often, and he takes his clients to other streams.

Ron Urban and Bruce Duffy, who are also members of CMCTU, testified that they have observed a significant increase in turbidity in the Esopus Creek below the Shandaken Tunnel and that they find that the turbidity is visually offensive and creates unsafe conditions for wading. Brother John Farrell, a member of FSC, has fished in the Esopus Creek since the mid–1980s. He testified that since 1996 he has observed that the Esopus Creek below the Shandaken Tunnel has become more turbid, causing it to be unsafe and affecting his aesthetic enjoyment of the Esopus Creek. He also testified that he very seldom fishes below the Shandaken Tunnel, except with an older friend who lives on the Esopus Creek in that area.

Defendant City of New York, by and through Defendant New York City Department of Environmental Protection ("NYCDEP"), is the owner and operator of the largest unfiltered drinking water supply in the United States.[2] Defendants provide high quality water to more than nine million residents of New York State, including eight million people who live in New York City and approximately one million people who live in Westchester, Putnam, and Rockland Counties. Defendant NYCDEP conducts and oversees operation of the Shandaken Tunnel.

The Catskill water supply system provides approximately forty percent of New York City's daily drinking water needs under normal operating conditions. This system consists of two reservoirs, the Ashokan and the Schoharie. The Shandaken Tunnel began operating in 1924. The water in the Schoharie Reservoir is diverted to the Esopus Creek, the main tributary to the Ashokan Reservoir, through the Shandaken Tunnel. The Shandaken Tunnel has a flow capacity of up to 650 million gallons per day. When the Shandaken Tunnel is in operation, water from the Schoharie Reservoir enters the Shandaken Tunnel through an intake channel on or in the bed of the Schoharie Reservoir. The Shandaken Tunnel runs approximately eighteen miles from the intake structure at the Schoharie Reservoir to the portal from which it discharges into the Esopus Creek eleven miles upstream of the Ashokan Reservoir. The Catskill aqueduct, which moves water from the Ashokan Reservoir to New York City's Kensico Reservoir in Westchester County, has a capacity of up to 610 million gallons per day. Two aqueducts bring water from the Kensico Reservoir into New York City.

The Catskill Mountains are characterized by extensive deposits of silts and clays that are continuous for miles in the valleys through which streams tributary to the Catskill reservoirs now flow. The Ashokan Reservoir is designed to provide settling time to minimize the turbidity of Catskill water by the time it enters the Catskill aqueduct on its way to New York City so that the water entering New York City's distribution system meets drinking water standards. The water discharged through the Shandaken Tunnel into the Esopus Creek is frequently substantially, visibly more turbid and higher in suspended solids than the receiving water because of the system design and the geology of the Schoharie drainage basin. The sus-

2. Defendant Joel Miele is the Commissioner of NYCDEP.

pended solids present in the Schoharie Reservoir are caused, at least in part, by erosion in the Schoharie Watershed, including erosion resulting from land disturbance from human activities.

The New York State Department of Environmental Conservation ("DEC") has designated the Esopus Creek, between the outlet of the Shandaken Tunnel and the inlet of the Ashokan Reservoir, as a class A(T) stream. The water quality standard for discharges of turbidity to a class A(T) stream is "no increase that will cause a substantial visible contrast to natural conditions." N.Y. Comp.Codes R. & Regs. tit. 6, § 703(2) (2002).

Pursuant to 33 U.S.C. § 1342, the Administrator of the EPA has delegated to the State of New York the authority to issue State Pollutant Discharge Elimination System ("SPDES") permits to dischargers in this State. DEC is the state agency that administers the SPDES program in New York. Defendants do not have a CWA permit or a SPDES permit for the operation of the Shandaken Tunnel, and, until the Second Circuit's decision on October 21, 2001, they maintain that they believed that they did not need a SPDES permit to operate the Shandaken Tunnel. Defendants operated the Shandaken Tunnel without a permit and, thus, in violation of the CWA on a total of 2,326 days from February 1, 1995 to December 31, 2002. *See* Defendants' Exhibit "D–17;" Letter to Court dated January 23, 2003.[3]

## B. Conclusions of Law

### 1. Standing

■ An organization has standing to bring an action on behalf of its members if it can establish that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citation omitted). To establish individual standing a person must show

(1) [that he/she] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 180–81, 120 S.Ct. 693.

■ In the present case, the testimony of Bert Darrow, Ron Urban, Bruce Duffy, and Brother John Farrow establishes that Plaintiffs have standing to bring this suit on behalf of their members. Each of these individuals testified that, at least since 1996, Defendants' discharge of water through the Shandaken Tunnel into the Esopus Creek has interfered with their enjoyment of the Esopus Creek—both aesthetically and in their ability to fish safely in the Esopus Creek—and, in the case of Bert Darrow, has interfered with his business as a flyfishing guide. Such injury is both concrete and particularized as well as fairly traceable to Defendants' actions. In addition, a decision in Plaintiffs' favor—i.e., requiring Defendants to reduce the turbidity of the water that flows through the Shandaken Tunnel into

---

**3.** After the trial was completed, the Court requested that Defendants submit a record of the discharges through the Shandaken Tunnel for the calendar year 2002, rather than rely upon an approximation based upon prior history. Defendants responded to the Court's request with the January 23, 2003 letter and attached chart.

the Esopus Creek—will redress their injuries.

Accordingly, based upon the testimony of Plaintiffs' members, the Court concludes that Plaintiffs have standing to bring suit against Defendants under the citizen-suit provision of the CWA.[4]

### 2. Civil Penalties

 As noted, this Court previously determined, upon remand from the Second Circuit, that Defendants had violated the CWA.[5] Thus, the only remaining issue is the amount of civil penalties and the nature of the injunctive relief that the Court should assess against Defendants.[6] In making its determination, the Court must keep in mind that the purpose of the CWA's penalty provision is "deterrence with respect to both the violator's future conduct (specific deterrence) and the general population regulated by the Act (general deterrence)." *United States v. Mun. Auth. of Union Township*, 929 F.Supp. 800, 806 (M.D.Pa.1996), *aff'd*, 150 F.3d 259 (3d Cir.1998) (citation omitted). To attain the goal of deterrence, the penalty must have two components: (1) "it must encompass the economic benefit of noncompliance to ensure that the violator does not profit from its violation of the law" and (2) it "must include a punitive component in the form of a sum in addition to economic benefit which accounts for the degree of seriousness and/or willfulness of the violations." *Id.*

Section 1319 of the CWA sets forth six factors that a court must consider when determining the amount of civil penalties to impose against a defendant:

> [1] the seriousness of the violation or violations, [2] the economic benefit (if any) resulting from the violation, [3] any history of such violations, [4] any good-faith efforts to comply with the applicable requirements, [5] the economic impact of the penalty on the violator, and [6] such other matters as justice may require.

33 U.S.C. § 1319(d).

Moreover, when applying these factors to a particular situation, "courts generally employ either a 'top-down' or 'bottom-up' method."[7] *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County*, 82

---

**4.** The Court notes that Defendants have never challenged Plaintiffs' standing. Moreover, at the summary judgment stage, both this Court and the Second Circuit implicitly concluded that Plaintiffs had standing to maintain this suit.

**5.** Defendants conceded that, in light of the Second Circuit's October 21, 2001 decision, they were liable for violating the CWA.

**6.** Several courts have stated that "[c]ivil penalties are mandatory once Clean Water Act violations are found, although the amount to be assessed is wholly within the discretion of the court." *Hawaii's Thousand Friends v. City & County of Honolulu*, 821 F.Supp. 1368, 1394 (D.Haw.1993) (citing *Atlantic States Legal Foundation v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir.1990); *Stoddard v. Western Carolina Regional Sewer Authority*, 784 F.2d 1200, 1208 (4th Cir.1986)); *see also Piney Run Pres. Ass'n v. County Comm'rs of*

*Carroll County*, 82 F.Supp.2d 464, 470 (D.Md. 2000), *vacated and remanded on other grounds*, 268 F.3d 255 (4th Cir.2001) ("The 'highly discretionary calculations necessary to assess penalties [under the CWA] are particularly within the purview of trial judges' and, therefore, are granted wide deference." (quotation omitted)). In addition, some courts have held that the issues of intent and fault are not relevant to the issue of whether the court should impose penalties but are only relevant with respect to the issue of the amount of the penalty. *See, e.g., United States v. Ohio Edison Co.*, 725 F.Supp. 928, 934 (N.D.Ohio 1989) (citations omitted).

**7.** The Second Circuit has not determined whether the "top-down" or the "bottom-up" approach is the appropriate means of calculating civil penalties under the CWA.

F.Supp.2d 464, 470 (D.Md.2000), *vacated and remanded on other grounds,* 268 F.3d 255 (4th Cir.2001) (citation omitted); *compare Union Township,* 929 F.Supp. at 806 (finding that "top-down" approach is not appropriate and choosing, instead, to "begin with economic gain and add a sum to that figure guided by the other § 1319(d) factors and the need for punishment and deterrence"); *with Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1137 (11th Cir.1990) (finding that "top-down" approach is the appropriate methodology for calculating CWA penalties).

If the "top-down" approach is used, the court will "first calculate the maximum penalty based on the $25,000 [$27,500 or $31,500] per day figure,[8] then adjust the figure down, as necessary, to account for the six factors listed in § 1319(d)." *Piney Run,* 82 F.Supp.2d at 470 (citing [*Smithfield,* 191 F.3d] at 528 n. 7); *see* 40 C.F.R. § 19.4. If, on the other hand, the court employs the "bottom up" method, the court will first "determine the economic benefit the defendant derived by violating the [CWA], and then adjust that figure upward or downward using the remaining five factors in § 1319(d)." *Piney Run,* 82 F.Supp.2d at 470 (citing [*Smithfield,* 191 F.3d at 528]).

■ For the reasons addressed below in its discussion of the economic benefit factor, based upon the circumstances of this case, the Court concludes that the "top down" approach provides the appropriate manner in which to determine the amount of civil penalties that should be awarded against Defendants for their violations of the CWA.

#### a. Maximum amount of penalties

Although the parties stipulated that the Shandaken Tunnel discharged water into the Esopus Creek on 1,983 days between February 1, 1995 and December 31, 2001, and approximately 150 days in 2002, the Court reviewed Defendants' Exhibit "D–17" (Bates 15935–15942), plus the additional data for the year 2002, which the Court requested, and determined that the Shandaken Tunnel was in operation for a total of 2,326 days during this period: 308 days (1995) + 185 days (1996) + 247 days (1997) + 275 days (1998) + 320 days (1999) + 280 days (2000) + 349 days (2001) + 362 days (2002).

Using these numbers, the Court then calculated the maximum civil penalties as follows:

| Year | Days | Maximum Penalty Per Day | Total |
|------|------|-------------------------|-------|
| 1995 | 308 | $25,000 | $ 7,700,000 |
| 1996 | 185 | $25,000 | $ 4,625,000 |
| 1997 | 3 | $25,000 | $ 75,000 |
| | 244 | $27,500 | $ 6,710,000 |
| 1998 | 275 | $27,500 | $ 7,562,500 |
| 1999 | 320 | $27,500 | $ 8,800,000 |
| 2000 | 280 | $27,500 | $ 7,700,000 |
| 2001 | 349 | $27,500 | $ 9,597,500 |
| 2002 | 231 | $27,500 | $ 6,352,500 |
| | 131 | $31,500 | $ 4,126,500 |
| | | **TOTAL:** | **$63,249,000** |

Using this figure as a starting point, the Court will address each of the six factors set forth in § 1319(d) in turn.

#### b. The seriousness of the violation or violations

■ To determine the seriousness of a defendant's violations, the court should consider "the frequency and severity of the violations as well as their effect on the

---

8. The maximum penalty is $25,000 per day for violations occurring on or before January 30, 1997, *see* 33 U.S.C. § 1319(d), $27,500 per day for violations occurring between January 31, 1997 and August 19, 2002, and $31,500 per day for violations occurring thereafter, *see* 40 C.F.R. § 19.4.

environment." *Piney Run*, 82 F.Supp.2d at 471 (citing *United States v. Smithfield Foods, Inc.*, 972 F.Supp. 338, 343 (E.D.Va. 1997)). Although some courts have acknowledged that "a significant penalty may be appropriate even absent proof of actual negative effect," *id.* (citing *Smithfield*, 972 F.Supp. at 344), other courts have found that the lack of material environmental harm is a significant mitigating factor even though the defendant has violated the CWA a significant number of times. *See Atlantic States Legal Found. Inc. v. Universal Tool & Stamping Co., Inc.*, 786 F.Supp. 743, 747–49 (N.D.Ind. 1992) (finding that, even though the defendant had violated its CWA permit more than 1,900 times during the relevant period, the lack of material environmental harm was a significant mitigating factor).

■ As noted, Defendants operated the Shandaken Tunnel without a permit, and thus violated the CWA, on 2,326 days between February 1, 1995 and December 31, 2002.[9] While this is a significant number of violations, the Court must also weigh the fact that the turbidity and suspended solids which Defendants discharged through the Shandaken Tunnel were not toxic and, at least in part, were the result of the natural conditions of the water that flowed through that Tunnel. Moreover, although there was some evidence at trial that the trout below the Shandaken Tunnel were smaller than the trout above the Shandaken Tunnel, there was no evidence of a significant decrease in the number of trout or of any trout kill as a result of the discharges. In fact, there was evidence that without the discharge of the water through the Shandaken Tunnel, there would have been less habitat for trout because of low water levels. Based upon this evidence, the Court considers this element to be a mitigating factor.

### c. The economic benefit resulting from the violations

■ The economic benefit that the violator enjoys as a result of violating the CWA is "[a] critical component of any penalty analysis under the [CWA] ...." *United States v. Allegheny Ludlum Corp.*, 187 F.Supp.2d 426, 436 (W.D.Pa.2002). "The goal of economic benefit analysis is to prevent a violator from profiting from its wrongdoing." *Id.* (citing *Dean Dairy*, 150 F.3d at 263). Since it is difficult to prove precise economic benefit, " 'reasonable approximations ... will suffice.' " *Piney Run*, 82 F.Supp.2d at 470 (quoting *Smithfield*, 191 F.3d at 529). In making this determination, "the court must endeavor to reach a " 'rational estimate of [the violator's] economic benefit, *resolving uncertainties in favor of a higher estimate.*" ' " *Union Township*, 929 F.Supp. at 806 (quotation omitted). "The estimate 'must encompass *every* benefit that defendants received from violation of the law.' " *Id.* (quotation omitted). "It would eviscerate the [CWA] to allow violators to escape civil penalties on the ground that such penalties cannot be calculated with precision." *Id.* at 806–07.

■ There are two elements to the calculation of economic benefit: "(1) the benefit that the [defendant] received from delayed capital spending (i.e., money saved

---

9. February 1, 1995 is the appropriate starting date for determining the amount of civil penalties to be awarded in this case because "in citizen enforcement actions the five-year statute of limitations period [set forth in 28 U.S.C. § 2462] is tolled sixty days before the filing of the complaint, to accommodate the statutorily-mandated sixty-day notice period." *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1524 (9th Cir.1987). Since Plaintiffs filed their complaint in this action on March 31, 2000, the five-year statute of limitations was tolled on February 1, 1995.

by delay in issuing and making payments on general obligation bonds to finance the construction of the required pollution control equipment); and (2) the operating and maintenance ("O & M") expenses for the pollution control equipment that the [defendant] avoided operating during the period compliance was delayed." *Hawaii's Thousand Friends,* 821 F.Supp. at 1387.

Plaintiffs did not submit any evidence with respect to the benefit that Defendants received by delaying capital spending. Rather, they focused their proof with respect to economic benefit on the operating and maintenance expenses that Defendants would have incurred had they built a coagulation plant near the Shandaken Tunnel. Dr. Bell testified that, by not building a coagulation plant, Defendants saved $27,083,833 in operational and maintenance costs for the period of February 1, 1995 through December 31, 2001. Although Defendants offered the testimony of David Nickols to rebut Dr. Bell's figures and the feasibility of Dr. Bell's design and his estimates of operational and maintenance costs, they did not present any other figure for the Court's consideration. In fact, based upon Mr. Nickols' testimony, if the Court were to take some of Defendants' arguments into consideration, the potential "economic benefit" to Defendants of not building a coagulation plant would increase.

That being said, however, the Court has some problems with Dr. Bell's testimony as it relates to the economic benefit that Defendants received as a result of their violation of the CWA. First, the Court questions the feasibility of Dr. Bell's plan, both from a design and construction stand-

point as well as an operational and maintenance perspective since he did not take into account the environmental impact of his design or the on-going effects on the environment—such as the increased traffic—that the construction of such a plant would have. In addition, Dr. Bell did not take into consideration the time required to design and construct such a facility. Mr. Nickols, however, estimated that it would take several years.

Allowing for several years to construct a coagulation plant of the type Dr. Bell suggested, the Court then must determine the appropriate date from which to measure the economic benefit of not constructing such a facility. If the Court were to measure the operational and maintenance savings from February 1, 1995, as Dr. Bell did, this would require a finding that Defendants should have begun work on the design and construction of a coagulation plant in approximately 1990.[10] If, on the other hand, the Court determines that Defendants should have begun work on design and construction of a coagulation plant on February 1, 1995 (when the statute of limitations was tolled for purposes of this action), November 20, 1998 (the date on which Plaintiffs served Defendants with their Notice of Intent to Sue), or October 21, 2001 (when the Second Circuit issued its decision), the operational and maintenance costs that Plaintiffs avoided would be far less than the $27,083,833 that Dr. Bell estimated because Defendants would not have incurred such costs until several years after they began construction on the coagulation plant.[11]

Nonetheless, despite the Court's problems with Dr. Bell's opinion regarding the

---

**10.** It would be unreasonable for the Court to measure Defendants' economic benefit from this date in light of the Court's finding, *see* discussion *infra* Part II.B.2.d, that it was reasonable for Defendants to believe, prior to October 21, 2001, that they did not need a

SPDES permit to operate the Shandaken Tunnel.

**11.** Assuming that it would have taken Defendants five years to design and build a coagulation plant, the earliest date that such a plant

economic benefit that inured to Defendants by not building a coagulation plant, the Court finds that this element is not a mitigating factor.[12]

### d. Any history of such violations

■ In determining the history of a defendant's violations, the court must consider "not only similar violations in the past, but also the duration and continuity of the [defendant's] present violations." *Piney Run*, 82 F.Supp.2d at 471 (citing *Smithfield Foods*, 972 F.Supp. at 349).

The evidence adduced at trial demonstrated that Defendants recognized the need to address, and have worked to formulate a plan to address, the turbidity problem in the Catskill system since 1993.[13] However, as Dr. Principe testified, Defendants did not believe that they needed a SPDES permit to operate the Shandaken Tunnel until October 21, 2001, when

the Second Circuit concluded that such a permit was necessary.

The Court finds that Defendants' belief, prior to October 21, 2001, that they did not need a SPDES permit to operate the Shandaken Tunnel was reasonable. In this regard, the Court notes that, although the EPA and DEC closely monitored the quality of Defendants' water supply pursuant to other statutes and were aware that Defendants discharged water through the Shandaken Tunnel as part of their water system, Dr. Principe testified that neither the EPA nor DEC ever suggested to Defendants that they needed a SPDES permit to operate the Shandaken Tunnel.[14] For these reasons, the Court finds that this element is a mitigating factor.

### e. Any good faith efforts to comply with the applicable requirements

Once Defendants were aware that they were required to have a SPDES permit to

---

would have come on line, using February 1, 1995, as a starting date, is approximately February 1, 2000. Applying the numbers in Dr. Bell's Table 5-1, *see* Plaintiffs' Exhibit "P-83," the approximate operational and maintenance costs that Defendants avoided by not having the coagulation plant in operation for the years 2000 through 2002 is roughly $13,684,759 ($4,198,979) (2000) + $4,551,718 (2001) + $4,934,062 (2002), assuming that the costs in 2002 increased by 8.4% over 2001. This is a very rough estimate because in Dr. Bell's table all costs are shown in 2001 dollars and the Court's 2002 costs are not.

**12.** The Court notes that § 1319(d)'s economic benefit element, the purpose of which is, at least in part, to ensure that a violator does not gain an economic advantage over its competitors, is of limited assistance to a court's determination of the appropriate amount of civil penalties to assess against a municipality which does not compete to provide water to its citizens. Moreover, a court must balance the economic feasibility of any proposed solution against the need of the municipality's citizens for an adequate water supply.

**13.** In 1993, a Filtration Avoidance Determination ("FAD") was issued, which addressed the turbidity problems in the Catskill system. *See* Defendants' Exhibit "D-12"—"Short- and Long-term Plans to Reduce Turbidity in Schoharie and Ashokan Reservoirs," dated June 1993; Defendants' Exhibit "D-14"—"Determination on Filtration of New York City's Catskill and Delaware Water Supplies, dated January 19, 1993; Defendants' Exhibit "D-23"—"Short- and Long-term Plans to Reduce Turbidity in Schoharie and Ashokan Reservoirs, 1993 4th Quarter Report," dated January 1994. In addition, the most recent FAD, dated November 2002, included long-term programs to reduce turbidity with time lines. *See* Defendants' Exhibit "D-61"—"New York City Filtration Avoidance Determination," USEPA—November 2002—"Surface Water Treatment Rule Determination for New York City's Catskill/Delaware Water Supply System."

**14.** In fact, on numerous occasions, DEC required Defendants to release water through the Shandaken Tunnel. *See, e.g.* Defendants' Exhibits "D-6," "D-8."

operate the Shandaken Tunnel (October 21, 2001), they began discussions with DEC to determine what information DEC would need before it could issue Defendants such a permit. Although Defendants and DEC met on only one or two occasions during the year following the Second Circuit's decision, as Dr. Principe noted, at the time Defendants received the Second Circuit's decision, shortly after the terrorist attack on September 11, 2001, they were in the midst of addressing other serious issues, including the safety of New York City's water supply.[15] In addition, although somewhat belatedly, Defendants did file a SPDES permit application on December 31, 2002.[16]

Based upon the evidence presented at trial, the Court concludes that Defendants' failure to apply for a SPDES permit until fourteen months after the Second Circuit's decision does not evidence a lack of good faith. When viewed against the backdrop of the September 11, 2001 terrorist attack and Defendants' compelling need to ensure, as their first priority, that New York City's water supply was safe, this delay—although somewhat extended—was not undue. Moreover, although Plaintiffs make much of the fact that everything that Defendants have done in the past with respect to the turbidity problem was done because of other statutes, and not in an attempt to comply with the CWA, the Court is not convinced that the particular

impetus for Defendants' actions is as important as the fact that Defendants have made efforts to abate the turbidity problem and continue to do so. Accordingly, based upon Defendants' ongoing efforts to address the turbidity issue and the fact that Defendants reasonably believed that they did not need a SPDES permit to operate the Shandaken Tunnel prior to the Second Circuit's decision on October 21, 2001, the Court finds that this element is a significant mitigating factor.[17]

### f. The economic impact of the penalty on the violator

"The central purpose of CWA penalties is to deter the defendant, and others, from committing future violations." *Piney Run*, 82 F.Supp.2d at 472 (citation omitted). "A damage award that is limited to economic benefit, therefore, is no deterrent at all because the violator would be no worse off than if it had complied in the first place." *Id.* (citation omitted); *see also Hawaii's Thousand Friends*, 821 F.Supp. at 1396 (finding that the economic impact of the penalty was not a mitigating factor where the penalty would result in only "a slight increase in the monthly rates paid by users of the sewer system").

The only evidence at trial with regard to this element indicates that Defendants could absorb the maximum penalty without serious consequences to their financial well-being. At his deposition, William

---

**15.** The Court notes that it found Dr. Principe to be a very credible and forthright witness, who readily acknowledged the need to address the turbidity problem in the Catskill water supply system. Moreover, the Court found Dr. Principe's knowledge of Defendants' water supply system and the regulations that govern this system to be very helpful to its analysis.

**16.** Dr. Principe acknowledged that at least part of the impetus for filing the permit at that time was the pending trial in this matter.

**17.** The Court notes, however, its concern that Defendants provided the Court with very little evidence to explain why they apparently failed to take any affirmative steps to comply with the Second Circuit's October 21, 2001 decision in a more expeditious manner. Had they done so, the Court would have been inclined to find that this element required an even greater mitigation of the maximum penalty allowable under § 1319(d).

Kusterbeck, Treasurer of the New York City Water Board, stated that the New York City Water Board maintains a $60,000,000 operations and maintenance reserve fund, equal to one month's operations and maintenance expenses, in part, to pay for unanticipated NYCDEP expenses incurred in water supply or distribution. *See* Transcript of Deposition of William Kusterbeck, dated September 18, 2002, at 28. Moreover, every million dollars in assessed penalties will result in only a one-time $.30 increase in the average water user's annual rate payment. Thus, the Court concludes that this element is not a mitigating factor.

### g. Such other matters as justice may require

Assessing a monetary penalty in this case would be tantamount to saying that if you believe in good faith that your activities are not subject to a CWA permit and neither the EPA nor DEC has ever indicated that you needed such a permit, you can be penalized if a citizen suit is commenced against you and the court finds that you are wrong. *See United States v. Bay–Houston Towing Co., Inc.,* 197 F.Supp.2d 788, 826 (E.D.Mich.2002). Thus, the Court finds that this element is a mitigating factor.

### h Calculation of civil penalties

██ As noted, the Court has used the top-down approach to calculate the amount of civil penalties to be assessed against Defendants. Therefore, the Court began its calculation with the maximum civil penalties that could be awarded against Defendants for the period from February 1, 1995 through December 31, 2002, i.e., $63,249,000. Having analyzed the other § 1319 factors, the Court finds that the lack of material environmental harm, Defendants' reasonable belief, prior to October 21, 2001, that they did not need a SPDES permit to operate the Shandaken Tunnel, and Defendants' efforts to address the turbidity problems, both before and after October 21, 2001, are mitigating factors. The Court also finds that, at the time of the Second Circuit's decision, it was reasonable for Defendants to focus much, if not all, of their attention upon the need to protect the water supply from any future terrorist attacks. Thus, their delay in submitting an application for a SPDES permit for at least several months was reasonable. Although the Court finds that the fourteen month delay was somewhat extended, the Court, nonetheless, concludes that an eight month .delay, i.e., until June 2002, would not have been unreasonable. Therefore, the Court concludes that no civil penalties should be assessed against Defendants for any violations occurring prior to June 22, 2002. This conclusion requires that the Court subtract $57,500,500 from the maximum allowable penalty to arrive at the final figure of $5,749,000.

### 3. Injunctive relief

██ ██ In citizen suit proceedings, district courts are statutorily authorized to enter injunctions. *See* 33 U.S.C. § 1365(a). "The proof of irreparable injury and the inadequacy of legal remedies are prerequisites to the granting of injunctive relief in a CWA case." *Cmty. Ass'n for Restoration of Env't ("CARE") v. Henry Bosma Dairy,* No. CY–98–3011, 2001 WL 1704240, *16 (E.D.Wash.2001) (citation omitted). "The Court must also balance the competing claims of injury and the public interest." *Id.* (citation omitted); *see also Million Youth March, Inc. v. Safir,* 155 F.3d 124, 126 (2d Cir.1998) (stating that "when a federal district court crafts an injunction to vindicate a plaintiff's protected rights, it cannot simply order whatever a City is physically capable of doing,

without regard to considerations of public health, safety, convenience, and cost.").

■ "Injunctive relief cannot automatically be granted upon a finding of statutory violation." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., AFL–CIO v. Amerace Corp., Inc.,* 740 F.Supp. 1072, 1086 (D.N.J. 1990) (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982)) (other citation omitted). Nor can "irreparable injury ... be presumed from the mere fact that the Clean Water Act has been violated." *Id.* In determining whether to grant an injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Moreover, although the court should give particular regard to the public interest, " '[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.' " *Id.* (quoting [*Weinberger v. Romero–Barcelo,* 456 U.S.] at 313, 102 S.Ct., at 1803, 72 L.Ed.2d 91).

Based upon the circumstances of this case, the Court concludes that it would be an improper use of injunctive relief to enjoin Defendants from operating the Shandaken Tunnel until they obtain a SPDES permit. This does not mean, however, that the Court is without power to fashion some form of injunctive relief which will take into account the injury of both sides of this dispute and, at the same time, to bring the discharges from the Shandaken Tunnel "into 'prompt' compliance with the [CWA]." *United States v. Confederate Acres Sanitary Sewer & Drainage Sys., Inc.,* 767 F.Supp. 834, 837 (W.D.Ky.1990) (citation omitted).

■ Fashioning effective injunction relief in this case, however, is complicated by the fact that, resolution of this problem, to some extent, rests with DEC, as it is the only agency with the authority to issue a SPDES permit. Thus, for the Court to order Defendants to obtain a SPDES permit within a certain time frame would be ineffective if DEC failed to cooperate. However, under the All Writs Act,[18] the Court's power "to effectuate the injunction may extend to 'persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice.' " *Id.* (quoting *United States v. New York Telephone Company,* 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977)) (citing *United States v. Wallace,* 218 F.Supp. 290 (N.D.Ala.1963)).

The testimony at trial indicated that, on average, DEC acts on an application for a SPDES permit within eighteen months. Given this timetable, the Court instructs Defendants that they are to provide DEC with all of the information that DEC needs to issue Defendants a SPDES permit as soon as practicable after DEC requests any such information. Moreover, pursuant to its authority under the All Writs Act, the Court instructs DEC, who is now a third-party Defendant in this action, to complete the application process and issue a SPDES permit to Defendants within eighteen months of the date of this Order. If, for any reason, DEC believes that it

---

**18.** The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

will be unable to complete the process and issue a permit to Defendants within this time frame, DEC is to inform the Court and the parties to this action in writing as to the reason for any delay as soon as DEC realizes that there will be a delay. In addition, the Court instructs Defendants to provide the Court and opposing counsel on the first day of each month, beginning March 1, 2003 and continuing until such time as they obtain a SPDES permit, a written status report as to the progress they have made towards obtaining a SPDES permit and any other measures Defendants have made toward reducing the turbidity of the water that is discharged through the Shandaken Tunnel. Finally, the Court instructs Defendants to notify the Court and opposing counsel in writing when they receive a SPDES permit and are to file a copy of this permit with the Court.

## C. Costs and Fees

In addition to civil penalties and injunctive relief, the CWA provides that a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). *See Tyson Foods*, 897 F.2d at 1143 (finding that in a case in which "a citizens group has succeeded on the merits, [the court could not] conceive of any grounds that would justify a denial of fees and costs."). A plaintiff who prevails in the liability phase of a CWA citizens suit is a prevailing party within the meaning of § 1365(d). *See CARE*, 2001 WL 1704240, at *17. Moreover, "[t]he award should be equal to full compensation comparable to that of a fee-paying client." *Hudson River Fishermen's Ass'n v. Arcuri*, 862 F.Supp. 73, 78 (S.D.N.Y.1994) (citing *Missouri v. Jenkins*, 491 U.S. 274, 286,

109 S.Ct. 2463, 2470–71, 105 L.Ed.2d 229 (1989)).

In their complaint, Plaintiffs seek attorneys' fees and costs. Since Plaintiffs prevailed in the liability phase of this action, the Court concludes that they are prevailing parties within the meaning of § 1365(d). As such, they are entitled to an award of reasonable attorneys' fees and costs. Therefore, the Court instructs Plaintiffs to file and serve an application for such an award within ten days of the date of this Order. In calculating the attorneys' fees portion of their application, the Court instructs Plaintiffs that their application must comply with the following rules. First, Plaintiffs must submit contemporaneous time records. Failure to do so will result in the Court substantially reducing the amount of attorneys' fees requested. *See New York v. Rac Holding, Inc.*, 135 F.Supp.2d 359, 363–65 (N.D.N.Y. 2001). Second, Plaintiffs shall calculate the amount of the fees they are requesting as follows: (1) the hourly rate for work attributable to a law intern is $65.00; (2) the hourly rate for work attributable to Mr. Coplan or any other admitted attorney is $125.00, unless that attorney can demonstrate that he has practiced in the area of environmental law for more than ten years, in which case the appropriate hourly rate is $175.00. *See IBEW Local No. 910 Welfare, Annuity & Pension Funds v. Dexelectrics, Inc.*, 98 F.Supp.2d 265, 275 (N.D.N.Y.2000).

Once Plaintiffs have filed and served their application for attorneys' fees and costs, Defendants must file and serve any objections they have to the application no later than fourteen days after service of the application upon them. Once the Court has received the parties' submissions, it will take the application under advisement and will issue an Order amending the Judgment accordingly.

## IV. CONCLUSION

Based upon the evidence adduced at trial and the applicable law and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants are liable for civil penalties in the amount of **$5,749,000** pursuant to § 1319(d); and the Court further

**ORDERS** that Defendants are to pay these civil penalties to the United States Treasury pursuant to § 1365(a); and the Court further

**ORDERS** the following injunctive relief pursuant to § 1365(a) and the All Writs Act: (1) Defendants are to provide DEC with all of the information that DEC needs to issue Defendants a SPDES permit as soon as practicable after DEC requests any such information, (2) DEC is to complete the application process and issue a SPDES permit to Defendants within eighteen months of the date of this Order, (3) if, for any reason, DEC believes that it will be unable to complete the process and issue a SPDES permit to Defendants within this time frame, DEC is to inform the Court and the parties to this action in writing as to the reason for any delay as soon as DEC realizes that there will be a delay, (4) Defendants are to provide the Court and opposing counsel, on the first day of each month, beginning March 1, 2003 and continuing until such time as they obtain a SPDES permit, with a written status report as to the progress they have made towards obtaining a SPDES permit and any other measures Defendants have made toward reducing the turbidity of the water being discharged through the Shandaken Tunnel, and (5) Defendants are to notify the Court and opposing counsel in writing when they receive a SPDES permit and are to file a copy of this permit with the Court; and the Court further

**ORDERS** that Plaintiffs are to file and serve their application for attorneys' fees and costs to the Court within ten days of the date of this Order pursuant to § 1365(d); and the Court further

**ORDERS** that Defendants are to file and serve any objections they have to Plaintiffs' application for attorneys' fees and costs no later than fourteen days after service of the application upon them; and the Court further

**ORDERS** that the Clerk of the Court is to enter judgment in favor of Plaintiffs and to close this case.

**IT IS SO ORDERED.**